### COMMONWEALTH *VS.* RANDY HOLLEY.

No. 99-P-1971.

Suffolk. May 16, 2001. - October 2, 2001.

Present: LAURENCE, SMITH, & MASON, JJ.

*Search and Seizure,* Automobile, Protective frisk, Fruits of illegal search. *Constitutional Law,* Search and seizure.

In the circumstances of a routine stop of a motor vehicle containing one occupant (defendant) by two police officers in a high-crime area, during which the defendant made an ambiguous gesture that was neither furtive nor threatening, there was not sufficient evidence to justify a patfrisk of the defendant and, consequently, the defendant was entitled to the suppression of the loaded handgun produced by the patfrisk. [662-666]

INDICTMENT found and returned in the Superior Court Department on March 20, 1998.

A pretrial motion to suppress evidence was heard by *Elizabeth B. Donovan,* J., and the case was tried before *Nonnie S. Burnes,* J.

*Joseph M. Ditkoff,* Assistant District Attorney, for the Commonwealth.

*Fred W. Sunderland, Jr.,* for the defendant, submitted a brief.

SMITH, J. After a jury trial in the Superior Court, the defendant was convicted of the following crimes: unlawful possession of a firearm, G. L. c. 269, § 10(*a*); receiving a firearm after its serial number had been removed or mutilated, G. L. c. 269, § 11C; unlawful possession of ammunition, G. L. 269, § 10(*h*); and possession of cocaine with intent to distribute, G. L. c. 94C, § 32A. On appeal, the defendant claims that the motion judge erred in denying his motion to suppress certain evidence obtained from a search of his person and a search of his motor vehicle. He also argues that the trial judge committed reversible error in allowing testimony to be introduced in evidence that was not relevant and was prejudicial.

1. *Denial of suppression motion.* The only witness at the suppression hearing was Trooper Bryan Garrant, the officer who conducted the search. The motion judge based her findings of fact on his testimony, which she deemed to be credible. We summarize the judge's findings of fact.

On February 5, 1998, Trooper Garrant was operating a marked cruiser on Melnea Cass Highway in the Roxbury section of Boston. He was accompanied by Trooper Thomas Kelley. At about 1:10 A.M., Trooper Garrant observed a vehicle about four to five car lengths ahead of his cruiser weaving across marked lanes. There were no vehicles between the cruiser and the car.

Trooper Garrant closed the distance between the cruiser and the car. He noticed the operator of the vehicle, later identified as the defendant, look in the rear-view mirror. Suddenly, the defendant, according to the motion judge's findings, "lurched to his right down toward the passenger area." As he did, the car veered to the right. Trooper Garrant did not know whether the defendant, in making the gesture, was secreting or retrieving something.

Trooper Garrant was familiar with the area as he had been assigned to work there for the past four years. The area was known to him and other troopers for drug and gun offenses. In addition, Trooper Garrant had made several "violent" arrests, in the area.

Trooper Garrant activated his blue lights in order to signal the defendant to pull over to the side of the road. The defendant stopped the vehicle in the travel lane. Trooper Kelley, using a microphone, ordered the defendant to pull over to the side of the road. The defendant complied with the order.

Troopers Garrant and Kelley got out of the cruiser. Trooper Garrant approached the driver's side while Trooper Kelley maintained a "cover" position on the passenger's side of the vehicle. The defendant was alone in the vehicle.

Trooper Garrant observed that the defendant appeared to be nervous and was sweating even though it was a cold night. Trooper Garrant opened the door of the vehicle and told the defendant to step out of the car and put his hands on the car. The defendant complied and the trooper began a patfrisk of the

defendant. The motion judge found that Garrant "started with the right pants pocket because the trooper did not know whether [the defendant] put something in his pocket when he reached down to the right while driving the car." Garrant felt a hard object, which he knew was a hand gun, in that pocket.

Because he was frightened by his discovery, Trooper Garrant signaled to Trooper Kelley for assistance. The defendant was handcuffed while Trooper Garrant removed the handgun from the defendant's pocket. Trooper Kelley disarmed the gun which had a magazine in it with one bullet in the chamber. The defendant was placed under arrest when he told the officers he did not possess a permit for the gun. Trooper Kelley asked the defendant if he knew that the serial numbers on the gun were removed. The defendant replied that he did not know.

Trooper Kelley conducted a search of the defendant. He discovered a glassine bag containing several individual pieces of crack cocaine, $1,600.00 in cash, and three pagers.

The defendant was transported to the State police barracks in Boston. Once there, he was advised of his Miranda warnings and questioned by Trooper Garrant. The defendant told Garrant that he had obtained the handgun in East Boston and that he was unaware that the serial numbers had been removed. The defendant also responded to a question that the $1,600.00 was a tax refund but that he did not know from what year. The defendant was issued a citation for the marked lane violation.

Based upon these findings, the motion judge denied the defendant's suppression motion, ruling that, because Trooper Garrant reasonably believed that his safety and that of Trooper Kelley were in danger, the defendant lawfully could be the subject of a patfrisk.

The issue tried at the suppression hearing was whether the patfrisk was improper. During the appeal process, however, the Supreme Judicial Court ruled in Commonwealth v. Gonsalves, 429 Mass. 658, 661-663 (1999), that art. 14 of the Declaration of Rights of the Massachusetts Constitution requires that a police officer, in a routine traffic stop, must have a reasonable belief that the officer's safety, or the safety of others, is in danger before ordering a driver out of a motor vehicle. Subsequently, on appeal, the defendant briefed the issue as be-

ing the lawfulness of the exit order, and not the patfrisk. In its brief, the Commonwealth responded to the challenge of the exit order.

We will not address the exit order issue because it was not before the motion judge. Therefore, we limit our discussion to the propriety of the patfrisk, which the motion judge decided against the defendant. The fact that we address the patfrisk issue and not whether there was justification for the exit order does not affect the result we reach because "[t]he standard for a patfrisk is the same as the standard required to justify an order to the occupants of a vehicle stopped for traffic violations to leave the vehicle." *Commonwealth* v. *Torres*, 433 Mass. 669, 676 (2001). Thus, to justify a patfrisk, whether it occurs in the context of a routine traffic stop, as here, or in the context of a *Terry*-type stop (*Terry* v. *Ohio*, 392 U.S. 1 [1968]), "we ask 'whether a reasonably prudent man in the policeman's position would be warranted in the belief that the safety of the police or that of other persons was in danger.' " *Commonwealth* v. *Vazquez*, 426 Mass. 99, 103 (1997). A mere "hunch" is not enough; rather the patfrisk must "be based on specific and articulable facts and the specific reasonable inferences which follow from such facts in light of the officer's experience." *Commonwealth* v. *Silva*, 366 Mass. 402, 406 (1974).[1]

The motion judge ruled that the patfrisk was proper because a "reasonably prudent person would be warranted in believing that his safety was at risk at 1:10 A.M. on Mel[nea] Cass Highway when he approached the car after the furtive gesture of [the defendant]." We examine the character of the area and the "furtive gesture" factors separately.

a. *Character of the area.* Trooper Garrant identified the area where the stop was made as a high-crime area, noted for violence and drug and gun arrests. It is clear from his testimony that the character of the area was the primary reason Trooper Garrant ordered the defendant out of the vehicle and pat frisked him.

---

[1] The initial stop of the vehicle was justified because Trooper Garrant observed it weaving across marked lanes, a violation of G. L. c. 89, § 4A. "Where the police have observed a traffic violation, they are warranted in stopping a vehicle." *Commonwealth* v. *Robles*, 48 Mass. App. Ct. 490, 493 (2000), quoting from *Commonwealth* v. *Santana*, 420 Mass. 205, 207 (1995).

The character of the neighborhood as a high-crime area is a relevant factor in determining whether there is reasonable suspicion of a threat to the officer's safety that supported a patfrisk. *Commonwealth* v. *Cheek*, 413 Mass. 492, 496-497 (1992). But this factor must be considered with some caution because many honest, law-abiding citizens live and work in high-crime areas. Those citizens are entitled to the protections of the Federal and State Constitutions, despite the character of the area. Therefore, the fact that a routine traffic violation takes place in a high-crime area does not allow the police, without more, to order a driver out of a vehicle or to conduct a patfrisk. *Ibid.* See *Commonwealth* v. *Thompson*, 427 Mass. 729, 734, cert. denied, 525 U.S. 1008 (1998) (character of area, by itself, not enough to provide reasonable suspicion to justify a patfrisk). Therefore, other factors must also be present in order to justify the patfrisk. See LaFave, Search and Seizure § 3.6(g) (3d ed. 1996).

b. *The defendant's "furtive gesture."* "A lunge or other furtive gesture is usually insufficient, by itself, to render a search reasonable." *Commonwealth* v. *Concepcion*, 10 Mass. App. Ct. 613, 616 n.2 (1980). Such movements, however, are a relevant factor to consider in determining the reasonableness of a patfrisk. *Ibid.*

Here, the motion judge found that when the defendant lunged down toward the front passenger floor, he made a furtive gesture.[2] The motion judge found that the furtive gesture caused Trooper Garrant to believe that the defendant "was either secreting or retrieving an object from the passenger well." In that regard, the motion judge further found that the reason that the trooper started the patdown of the defendant with the defendant's right pants pocket was because Trooper Garrant knew that "[i]f [the defendant] had retrieved a weapon from the right side of the car [he] probably would put [it] in a pocket on his right side."

Those findings of the judge were not supported by the

---

[2]Trooper Garrant did not label the defendant's motion as a "furtive gesture." The prosecutor, in his closing argument at the suppression hearing, called the gesture "furtive" and the judge in her findings adopted that language.

evidence and indeed are contradicted by Trooper Garrant's testimony which the motion judge deemed to be credible.[3]

More specifically, Trooper Garrant testified that before the stop he saw the defendant "lean dramatically to his right with both his upper torso and his arm toward the passenger's side visor." Trooper Garrant did not testify, as the motion judge found, that the defendant made a furtive gesture "down toward the front passenger floor." Thus, the undisputed evidence on this point was that Trooper Garrant observed the defendant leaning *up* toward the passenger's side visor, not *down* toward the floor.

In addition, the motion judge found that because Trooper Garrant "believed [the defendant] was either secreting or retrieving an object from the passenger well . . . he began and ended the patdown at the right pant pocket [because] if [the defendant] had retrieved a weapon from the right side of the car [he] probabl[y] would put [it] in a pocket on his right side."

That finding is also contradicted by Trooper Garrant's testimony. When asked by the prosecutor why he went to the defendant's right front pocket when he started to pat frisk the defendant, Trooper Garrant responded, "There was no specific reason. It's my own idiosyncracy as far as the pants pocket, I feel the pants pocket first. I'm right handed so I did the right-hand pocket first."

The motion judge's erroneous findings were not merely misstatements of fact that were not essential to her ultimate conclusion. Contrast *Commonwealth* v. *Rodriguez*, 425 Mass. 361, 368 (1997). Rather, these findings were critical to her ultimate conclusion that the patfrisk was justified.

The phrase "furtive gesture" appears in many decisions where

---

[3]In reviewing the denial of a suppression motion "we accept the motion judge's subsidiary findings of fact absent clear error. . . ." *Commonwealth* v. *Mello*, 420 Mass. 375, 381 n.8 (1995). "A finding is clearly erroneous when there is no evidence to support it, or when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Custody of Eleanor*, 414 Mass. 795, 799 (1993), quoting from *Building Inspector of Lancaster* v. *Sanderson*, 372 Mass. 157, 160 (1977). Therefore, we are not obligated to defer to a motion judge's findings if that finding is not supported by the evidence. See *Commonwealth* v. *Murdough*, 428 Mass. 760, 763 (1999).

the issue is whether a patfrisk or a search of a vehicle is justified. The gestures are interpreted by the police (and by the courts) as demonstrating the hiding of contraband or as threatening the officers' safety. See *Commonwealth* v. *Vanderlinde*, 27 Mass. App. Ct. 1103, 1104 (1989) (police justified in reasonable belief that their safety was in danger when suspect reached into the "well" between the driver's seat and that of the passenger); *Commonwealth* v. *Rivera*, 33 Mass. App. Ct. 311, 315 (1992) (fact that defendant bent forward, as if to place something on the floor, as trooper approached the car, could be considered as factor in the search); *Commonwealth* v. *Heughan*, 40 Mass. App. Ct. 102, 104 (1996) (police could consider bending movement of rear-seat passenger, a motion that reasonably could be taken as placing or retrieving an object beneath the driver's seat).

The gesture that Trooper Garrant testified he observed was not furtive, as defined in the court decisions. The fact that a motorist, when in the process of being stopped, leans over to the passenger side visor, cannot be considered as a threatening gesture, or one that can be considered as hiding contraband. To hold otherwise, would mean that any gesture, no matter how innocent or trivial, could be interpreted as a furtive gesture.

2. *Conclusion.* The undisputed evidence leaves us with a routine traffic stop in a high-crime area during which the defendant made an ambiguous gesture which, at best, could not be deemed to be either furtive or threatening. In addition, we note that there were two police officers and only one occupant of the vehicle (the defendant). This was not a situation where the police were outnumbered by the occupants of a vehicle and therefore could take reasonable precautions, such as a patfrisk, to protect their safety. See *Commonwealth* v. *Torres*, 433 Mass. at 670-671.

In these circumstances, we hold that the defendant's suppression motion should have been allowed because there was not sufficient evidence to justify the patfrisk.

We recognize that the patfrisk produced a loaded handgun. However, "a search is not to be made legal by what it turns up." *United States* v. *Di Re*, 332 U. S. 581, 595 (1948). See also *Byars* v. *United States*, 273 U.S. 28, 29 (1927), where the

United States Supreme Court stated, "A search prosecuted in violation of the Constitution is not made lawful by what it brings to light; and the doctrine has never been recognized by this Court, nor can it be tolerated under our constitutional system . . . ."

Because the discovery of the cocaine was a direct result of the unlawful patfrisk, it too must be suppressed under the "fruit of the poisonous tree" doctrine set forth in *Commonwealth* v. *Reyes*, 423 Mass. 568 (1996).

The order denying the suppression motion is vacated. Because it does not appear on this record that the Commonwealth will be able to meet its burden without the suppressed evidence, we reverse the judgments, set aside the verdicts, and order entry of judgments of not guilty.

*So ordered.*